# CHARLESTON

STATE *v.* SARAH ANN LEGG.

| 59 | 315 |
|----|-----|
| f62 | 132 |

Submitted March 7, 1906.     Decided April 10, 1906.

1.  CRIMINAL LAW— *Record—Evidence—Bill of Exceptions.*
    Where evidence is certified by the trial judge, and a separate
    bill of exceptions is used to make it a part of the record, a refer-
    ence in the bill to the certificate of evidence, stating that it is
    made a part of the record, and a part of the bill of excep-
    tions, is sufficient to make the evidence a part of the record.
    (p. 317.)

2.  WITNESSES—*Refreshing Memory—Memorandum.*
    The testimony of a witness, upon the preliminary examination
    of one accused of crime, may be used by the witness upon the
    trial of such accused person for the purpose of refreshing his
    present recollection, but when so used it is not admissible in evi-
    dence and should not be read to the witness in the presence of the
    jury. (p. 321.)

3.  CRIMINAL LAW—*Evidence—Sworn Statement of Accused.*
    Where a justice, for the purpose of determining whether or not
    he will hold an inquest, takes the sworn statement of a person who
    is not, at the time, accused of killing the deceased, but against
    whom an indictment is afterwards preferred, such statement is ad-
    missible upon the trial of the accused; not having been made by
    the person as a witness upon a legal examination, it is not protected
    under section 20, chapter 152, Code 1899.   A justice, in taking
    such statement, is without warrant of law.   (p. 323.)

4.  HOMICIDE—*Evidence.*
    Upon the trial of a wife, for the murder of her husband, testi-
    mony tending to show the existence, prior to the alleged killing,
    of adulterous relations between the prisoner and a third person, is
    admissible, for the purpose of showing motive for the commission
    of the offense.   (p. 324.)

5.  SAME —*Instructions.*
    Where, upon a trial for murder, the killing is shown to have
    been done with a deadly weapon, and the defendant relies upon ac-
    cidental killing as an excuse, it is a question for the deter-
    mination of the jury as to whether the killing was intentional, or
    the result of an accident.   And when the evidence tends, in an
    appreciable degree, to establish both theories, it is the duty of the
    court to instruct the jury presenting both, if asked to do so.   (p.
    325.)

6.  INSTRUCTIONS—*Purpose Of.*
    The purpose of giving instructions is to aid the jury in arriving

at a proper verdict, and the practice of repeating them is discounte-
nanced.   (p. 327.)

6.   SAME—*Credibility of Witnesses.*

It is not error, where an instruction is asked telling the jury that
they are the sole judges of the credibility of the witnesses, and
that they have the right to believe or not believe any witness who
has testified in the case, to modify the instruction so as to tell them
that they cannot arbitrarily disregard the testimony of a witness
unless they believe it untrue.   (p. 328.)

8.   HOMICIDE—*Instructions.*

An instruction which tells the jury that before they can find the
defendant guilty of murder, they must believe from the evidence
beyond all reasonable doubt, that the defendant willfully, mali-
ciously, deliberately, feloniously and unlawfully killed the de-
ceased, is erroneous, in this, that it is not necessary that these
elements should co-exist in order to find the defendant guilty of
murder in the second degree.   (p. 329.)

9.   SAME.

An instruction saying that before the jury could find the de-
fendant guilty of murder, they must believe from the evidence
beyond all reasonable doubt, that the defendant maliciously,
feloniously and unlawfully killed the deceased, is erroneous in
not limiting the instruction to murder in the second degree.   (p.
329.)

10.   SAME.

Where one, upon an indictment for murder, relies upon acci-
dental killing as a defense, and there is evidence tending in an
appreciable degree, to establish such defense, it is error to re-
fuse to instruct the jury that if they believe from the evidence
that the killing was the result of an accident, they should find the
defendant not guilty.   (p. 330.)

11.   SAME.

On a trial for murder, where the defense is that the killing was
accidental, it is error to instruct the jury that they shall find
the defendant not guilty if they believe the killing was the result
of an accident, unless they further find that the defendant was
guilty of criminal carelessness, without instructing as to what con-
stitutes criminal carelessness, and without further qualifying the
instruction so as to enable the jury, if they should find the de-
fendant guilty of that offense, to properly fix the degree of crime.
(p. 330.)

12.   SAME—*Evidence to Support Instructions.*

Where, upon a trial for murder, the defendant relies upon ac-
cidental killing as a defense, it is error for the court, when
asked to instruct the jury that if they believe from the evidence

that the killing was accidental, and not intentional, they should find the defendant not guilty, to refuse to do so; and it is also error for the court to modify such instruction so offered so as to present a theory of the case to them, when there is no evidence, or, if any, when it does not tend, in an appreciable degree, to support such theory. (p. 330.)

Error to Circuit Court, Clay County.

Sarah Ann Legg was convicted of murder and brings error.

*Reversed.*

Horan & Horan and W. E. R. Byrne, for plaintiff in error.

C. W. May, Attorney General for the State.

Sanders, Judge:

This writ of error is to a judgment of the circuit court of Clay county, convicting the defendant, Sarah Ann Legg, of the murder of her husband, Jay Legg, and sentencing her to be hanged.

The Attorney General asserts that the evidence is not made a part of the record by proper bill of exceptions, and relies upon *Tracy's Admx.* v. *Carver Coal Co.*, 57 W. Va. 587; *Dudley* v. *Barrett*, 52 S. E. R. 100; *Ry. Co.* v. *Joyce*, 52 S. E. R. 498, and *Parr* v. *Currence*, 52 S. E. R. 496, to support this contention. The rule announced in these cases has no bearing upon the case under consideration. There it was held that the evidence had not been made a part of the record. In *Tracy's Admx.* v. *Coal Co.*, a skeleton bill of exceptions was used for the purpose of certifying the evidence and making it a part of the record, with parenthetical instructions to the clerk to insert stenographer's transcript of evidence. It did not even appear that the evidence had been transcribed by the stenographer, and if not, it could not not have been certified by the judge, as required. By section 9, chapter 131, Code 1899, it is provided that a party may except to any action or opinion of the court, and tender a bill of exceptions, and if the action or opinion of the court be upon any question involving the evidence, or any part thereof, the court shall certify all the evidence touching such question, and the judge shall sign any

such bill of exceptions, and it shall be made a part of the record. The judge cannot certify evidence which is not written out and before him at the time, so as to comply with the requirement of the statute. Also, in that case, the stenographer's transcript of the evidence bore no mark or memorandum to which reference was made, by which it could be safely identified as the evidence adduced upon the trial. It is not necessary to review the other cases referred to and relied upon, because by consulting them it will be found that they differ widely from the case in hand. The evidence here was certified by the judge, and by a separate bill of exceptions made a part of the record by referring to it as the "certificate of evidence." It is insisted, however, that the bill, in attempting to make the evidence a part of it, says: "Here insert certificate of evidence, which is made part of the record in said case, and a part of this bill of exceptions," and that the bill only attempts to make the certificate a part thereof. The bill calls for and makes a part of it the *certificate of evidence.* What certificate of evidence? The certificate of evidence in the case, to which the bill of exceptions related. The evidence had been certified by the judge, as required by statute; the certificate of evidence showed the style of the case, and that the evidence contained in it was the evidence, and all the evidence, introduced upon the trial, and was signed by the presiding judge. The certificate was self-identifying, as much so as the bill of exceptions itself. Then we have the judge certifying all the evidence, which is, by a separate bill of exceptions, made a part of the record by unmistakable reference thereto.

There are many errors assigned as reasons for reversing the judgment of the circuit court, and awarding the prisoner a new trial, which will be considered in the following order:

I. Complaint is made that the trial judge examined and cross-examined certain witnesses, in such manner as operated prejudicially to the prisoner. The record shows that the judge did examine some of the witnesses at considerable length. Whether such examination was proper or not, and ground for reversal, we are not called upon to determine. In order to demand a review of the action of the trial court in this respect, there should have been an objection to the exam-

ination, and if overruled, proper exceptions taken. There was no objection made to the examination by the judge, except to one question, and we cannot say that the asking of this single question was prejudicial to the prisoner. Nor does it appear that the court was asked to set aside the verdict upon this ground. Where the action of the trial court is sought to be reviewed upon the ground that improper questions were asked witnesses, or that the judge, in examining such witnesses, did so in an improper manner, there should be an objection and exception to such course.

II. It is insisted that certain evidence was improperly admitted over the objection of the defendant. Pat Butler, who had been a witness upon the preliminary examination of the accused, and whose evidence had, upon such examination, been reduced to writing, also testified upon the trial. It appears that this witness was at the home of the defendant immediately after the shooting, and after having stated, upon his examination as a witness upon the trial of this case, that while there he had overheard a conversation between the defendant and Willis Ashley, in which the defendant stated that the shooting was an accident, he was asked what else, if anything, was said in the conversation, to which he replied, "I can't recall the language." He was then asked if he could recall any of the conversation, and his response was, "I don't believe I can." Then it was inquired of him if he had not given evidence upon the preliminary examination of the accused, and after having stated that he had, he was asked if he remembered a question propounded to him on cross-examination, and the answer he had given. The answer which it was claimed he had made to such question was read to him, in the presence of the jury, which is as follows: "She said that he come in and told her to get the gun for him and she went and got it, and I don't remember which one asked whether it was loaded, anyway she said it was loaded, and he said it was not, and they repeated it two or three times, and he told her to snap it, and she snapped it, and it went off." He replied, "Yes, sir, I remember that." And then he was asked if he heard the defendant there, at that time, tell how the killing occurred, to which he answered, "Yes, sir." Then he was interrogated as to how she said it occurred, and he replied, "Well, she said that he came in and called for the gun,

and she got the gun and one of them said it was loaded, I don't remember which one, and the other said it was not, and they repeated that two or three times, and then he told her to snap the gun, and she snapped it, and it went off." The question we have to determine is whether or not it was proper to read to the witness his answer given upon the preliminary examination, for the purpose of stimulating and reviving his recollection.

"It is today generally understood that there are two sorts of recollection which are properly available for a witness,—past recollection and present recollection. In the latter and usual sort, the witness either has a sufficiently clear recollection, or can summon it and make it distinct and actual, if he can stimulate and refresh it, and the chief question is as to the propriety of certain means of stimulating it,—in particular, of using written or printed notes, memoranda, or other things as refreshing it. In the former sort, the witness is totally lacking in present recollection and cannot revive it by stimulation, but there was a time when he did have a sufficient recollection and when it was recorded, so that he can adopt this record of his then existing recollection and use it as sufficiently representing the tenor of his knowledge on the subject. This use of a past recollection depends of course on certain conditions; while the stimulation of an actual present recollection need be subject to no fixed rules; and it is through the improper application of the limitations of the one case to the other that some confusion of decisions has arisen." 1 Greenleaf on Ev., (16th Ed.), sec. 439a; 1 Wigmore on Ev., secs. 734, 738.

It will be necessary to know whether or not the answer read to the witness, and which was given upon the preliminary examination was used to revive a present recollection, or whether it was employed as the past recollection of the witness, because there are certain fixed rules regulating the use of a past recollection which do not apply to the use of a writing for the purpose of refreshing a present recollection. We will not here attempt, however, to discuss the rules applicable to the use of a past recollection, except in so far as is necessary in dealing with the question under consideration. The situation as to past recollection is where a witness is devoid of a present recollection, and desires to use a past rec-

ollection.   The witness, upon a perusal of the record or memorandum of a fact or transaction, may not be able to call to mind and testify to an existing knowledge of the fact, independent of the memorandum or writing.   The writing fails to refresh and revive the recollection, and thus constitute a present knowledge.   So if the witness testifies that at or about the time the memorandum was made, he knew its contents, and knew them to be true, this legalizes and lets in both the testimony of the witness and the memorandum.  "If by verifying and adopting the record of past recollection the witness makes it usable testimony, and if by this verification alone can it become so usable, it follows that the record thus adopted becomes to that extent the embodiment of the witness' testimony.   Thus, *the record, verified and adopted, becomes a present evidentiary statement of the witness; and as such it may be handed or shown to the jury by the party offering it.*  * * *  A few decisions declare that the writing is not 'independent evidence' or 'in itself evidence,' but this is to be construed as meaning merely—what no one could deny—that without being verified and adopted it is without standing.   A few others expressly refuse to allow it to be 'read in evidence' or 'given in evidence.'   But these must be regarded as unsound in principle."   1 Wigmore on Ev., sec. 754.

In *Moots* v. *State*, 21 Ohio St. 653, it is said:  "The entry in the book and the oath of the witness supplement each other.  The book was really a part of the oath, and therefore admissible with it in evidence."

Also, in *Howard* v. *McDonough*, 77 N. Y. 592, it was held that after the witness has testified, the memorandum which he has used may be put in evidence,—not as proving anything of itself, but as a detailed statement of the items testified to by the witness.

Judge Cooley, in *Mason* v. *Phelps*, 48 Mich. 126, said: "After she had testified that she knew it to be correct, she might have read the entries or repeated them as her evidence. Showing the book was no more than this."

It is held in *Bryan* v. *Moring*, 94 N. C. 687:  "The memorandum thus supported and identified becomes part of the testimony of the witness, just as if without it the witness had

orally repeated the words from memory.'' 1 Greenleaf on Ev., (16th Ed.), section 439*b*.

The witness, in proceeding to testify from a present or existing recollection, may be unable to do so by unaided mental effort. But by resort to some memorandum or writing, his memory may be so stimulated and refreshed as to enable him to recollect the fact, and where this is so, it is not proper to introduce the writing in evidence, or read it in the presence of the jury, because it forms no part of the testimony, being used only for the purpose of aiding the mental effort of the witness to recollect the particular transaction. ''But since, in Lord Ellenborough's words, 'It is not the memorandum that is the evidence, but the recollection of the witness,' the party whose witness uses it has no right to have it read or handed to the jury; it is only the opponent who wishes to do this in case he wishes to cast doubt on the reality of the refreshment of memory.'' 1 Greenleaf on Ev., (16th Ed.), section 439*c*.

Wigmore on Evidence, section 763, in speaking of a writing used to revive a present recollection of a witness, says: ''It follows from the nature and purpose for which the paper is used, that it is in no sense testimony. In this respect it differs from a record of past recollection, which is adopted by the witness as the embodiment of his testimony and, as thus adopted, becomes his present evidence and is presentable to the jury. Nevertheless, though the witness' party may not present it as evidence, the same reason of precaution which allows the opponent to examine it allows him to call the jury's attention to its features, and also allows the jurymen, if they please, to examine it for the same end. In short, the opponent, but not the offering party, has a right to have the jury see it.''

It is held in *Gregory* v. *Taverner*, 6 C. & P. 281: ''The memorandum itself is not evidence, and particular entries only are used by the witness to refresh his memory. * * * The defendant's counsel may cross-examine on the entries already referred to, and the jury may also see those entries if they wish to do so.''

In *Com.* v. *Jeffs*, 132 Mass. 5: ''The opposite party is entitled to cross-examine the witness in regard to it; and it may be shown to the jury; not for the purpose of establishing the

facts therein contained, but for the purpose of showing that it could not properly refresh the memory of the witness."

This doctrine gives to the defendant the right to cross-examine as to such paper, and also, if he desires, to introduce it to the jury, to show that the memory of the witness could not thereby be revived, but does not give to the party who uses it for the purpose of refreshing the memory of the witness, the right to introduce it in evidence.

Having shown that a writing or memorandum used to refresh a present recollection cannot be read to the witness nor introduced to the jury, we have only to inquire, was the answer of the witness given upon the preliminary examination used to revive a present recollection, or was it the use of a past recollection? The witness shows clearly that when the answer was read to him, he remembered the conversation. This he expressly states, and further on in his testimony, in answer to a question as to how the defendant said it occurred, he states, substantially, the facts embodied in the answer read to him. Therefore, it is perfectly apparent that the use of the answer was for the purpose of refreshing the present recollection of the witness, and this being so, and it being read to him in the presence of the jury, we must conclude that it was error to do so.

III. Were the statements of the defendant that are claimed to have been made to R. A. Hamrick, a justice of the peace, admissible? It is claimed that these statements were made upon a legal examination, and, for that reason, were inadmissible. Section 20, chapter 152, Code 1899, provides: "In a criminal prosecution, other than for perjury, evidence shall not be given against the accused of any statement made by him as a witness upon a legal examination." In *Hall's Case*, 31 W. Va. 505, it was held error to permit the state, upon the trial of the prisoner, to prove a statement made by him when he was before the justice on his preliminary examination, and in *Kirby's Case*, 77 Va. 681, evidence was admitted to show that the accused had, upon a previous trial, made statements different from his evidence on his second trial, which was held to be error. These cases do not measure up to, and are not decisive of, the question here presented. In those cases there was no question as to the examination being a legal one, but here, while the statements were made,

it is true, at the solicitation of the justice, and after the defendant had been sworn by him, still the question arises, was this a legal examination, such as is contemplated by the statute? Just after the killing, the justice, for the purpose of determining whether or not an inquest should be held, requested the defendant to make a statement, to which she willingly acceded, saying that she had no objection to doing so. This cannot be regarded as a legal examination. The law makes no provision for it, and does not recognize it as such. No coroner's jury had been summoned, and there was no inquest being held. An investigation was simply being made for the purpose of determining the propriety or impropriety of holding an inquisition. And, again, the statement was not made upon the preliminary examination of the defendant, because at that time no accusation had been preferred against her. No warrant had been issued—no examination was being held. We must not so construe the statute as to give to it a meaning which its clear language does not import. It only extends protection as to any statement made by a "witness upon a legal examination." The defendant, at the time she made this statement, was neither a witness, nor was it made upon a legal examination.

IV. It is claimed that the court erred in admitting the testimony of the witnesses, Eagle and Hays, as to what occurred at the home of the Leggs on the night preceding the killing. This evidence was introduced for the purpose of showing the existence of improper relations between the defendant and these witnesses, or one of them, and is excepted to on the ground that it had a tendency to prejudice the minds of the jurors against the defendant. The court instructed the jury that even if they should find that any improper relations existed between these witnesses and the defendant, they should not consider that upon the question of her guilt or innocence of the crime charged against her, unless they should find from the evidence that such conduct and relationship between the parties was a motive for the commission of the crime. With the qualification annexed by the court, the evidence was competent. If admitted only for the purpose of showing motive, the objection urged against its admission, that it was not shown that the deceased knew anything of the visit of these witnesses to his house, fails, for if the relations

existing between these witnesses and the defendant furnished a motive for the commission of the offense, it is immaterial whether the deceased knew of such relations or not. Wharton's Criminal Evidence, section 785, says: "Among the circumstances from which malice, in a killing by a husband of his wife, may be inferred, are adultery by either husband or wife, illustrating a desire to get rid of the marital relation." See, also, *State* v. *Watkins*, 9 Conn. 49; *Shaw* v. *State*, 102 Ga. 660; *Hinshaw* v. *State*, 147 Ind. 334. It is said that the admission of this testimony merely afforded the jury full and free rein for conjecture. But if testimony be competent and relevant, it must be admitted, and confidence placed in the jury that they will legally apply it. It is the duty of the court, if asked to do so, to instruct the jury as to the applicability of the evidence, as was done in this case, and it is the duty of the jury to observe the direction of the court as to the law governing such evidence. That they exercised their judgment soundly, is a presumption of law.

V.    Another reason advanced for reversal is that the court, at the instance of the state, and over the objection of the prisoner, gave to the jury certain instructions.

*Instruction No. 1*—The court instructs the jury that a man (or a woman as in this case) is presumed to intend that which he does, or which is the immediate or necessary consequence of his act; and if the prisoner with a deadly weapon in her possession, without any or upon very slight provocation, gives to another a mortal wound, the prisoner is *prima facie* guilty of wilful, deliberate and premeditated killing, and the necessity rests upon her of showing excusing or extenuating circumstances, and unless she proves such excusing or extenuating circumstances, or the circumstances appear from the case made by the state, she is guilty of murder in the first degree."

The objection urged to this instruction is that the defense interposed was that the killing was accidental, and this being so, the jury should not have been told if the defendant relies upon excusing or extenuating circumstances, the burden is upon her to establish the same. Where there is any evidence tending in an appreciable degree to support a particular theory of a case, the court may give to the jury instructions presenting it to them. This instruction proceeds upon the

theory that the killing was intentional, and if there is evidence tending to show this, the state is entitled to an instruction presenting this phase of the case.  If the defendant relied upon accidental killing as an excuse, it was proper for her to present this question to the jury, also, and then for the jury to determine, from all the facts and circumstances, as to whether or not the killing was done intentionally and with malice.  There is no question but what the defendant killed the deceased, with a deadly weapon.  This appearing, the law presumes that it was murder in the second degree.  But if from the state's own showing, or from the testimony of the defendant, it appears that the killing was accidental, then the defendant would be excused.  But the jury are to determine this fact.  It is true that the burden is upon the state to prove the killing, that it was intentional, and with malice.  The state offers evidence to prove the killing, with a deadly weapon, which the defendant herself admits, and this being so, how is it to be determined whether or not it was intentionally done?  It must be gathered from all the facts and circumstances surrounding the transaction, and it is peculiarly within the province of the jury to determine this, according to the well settled rules of law.  And this being so, it is proper for the court to say to the jury that if they believe the homicide was committed with a deadly weapon, and without any or upon slight provocation, that they should find the defendant guilty, unless, from all the other evidence, it appears that it was accidentally done.  This is practically what was propounded to the jury in this case.  Malice is presumed from the use of a deadly weapon.  But if it is shown to have been an accident, this presumption is rebutted.  "The defense of accidental and unintentional killing does not preclude the giving of instructions embodying the law relating to any offense charged in the indictment which the evidence tends to prove."  *State* v. *Paul Clifford*, 59 W. Va. 1.

It is said that this instruction does not differ in substance and effect from instruction B, given in *Cross' Case*, 42 W. Va. 258.  The vice of instruction B, in that case, was that it told the jury if the defendant relied upon the defense of accidental killing, that the burden was upon him to prove such defense, and to avail him, he must establish it by a prepond-

erance of the evidence.  Where accidental killing is relied upon as a defense, the accused is not required to prove such defense by a preponderance af the evidence, because there is a denial of intentional killing, and the burden is upon the state to show that it was intentional, and, if, from a consideration of all the evidence, both that for the state and the prisoner, there is a reasonable doubt as to whether or not the killing was accidental, or intentional, the jury should acquit.  The court, in giving said instruction B, confounded the doctrine of the law of self-defense with the rules applicable to the defense of accidental killing, as where self defense is relied upon, the burden is upon the accused to prove such defense by a preponderance of the testimony, because the killing is admitted, and it is admitted to have been intentional.  Therefore, in order to justify it, the burden is upon the prisoner of showing such a state of facts as warranted his course.  But where accidental killing is relied upon, the prisoner admits the killing, but denies that it was intentional.  Therefore, the state must show that it was intentional, and it is clearly error to instruct the jury that the defendant must show that it was an accident by a preponderance of the testimony, and instruction B, in the *Cross Case*, was properly held to be erroneous.  But it does not control the principle involved in the consideration of the instruction here, and we think there was no error committed in giving it.  For the same reasons advanced to show that this instruction was properly given, we think there was no error in giving instructions 7 and 9.

As to instructions Nos. 2, 3, 4 and 5.  By these instructions it is undertaken to define reasonable doubt.  We see no objection to these instructions as such.  They seem to define reasonable doubt correctly, and no objection to their correctness is pointed out.  But it is urged that the court erred in giving them, because they are upon the same point, and for the same purpose, and that a continued repetition of instructions upon a single point is calculated to prejudice the defendant.  It was entirely unnecesssary to repeat these instructions.  It is manifestly improper to do so.  The purpose of instructing a jury is to aid them in arriving at a proper verdict, and not to confuse them, and in order to be of aid, instructions should not be repeated, but when one

given, presenting a particular theory of a case, no other instruction presenting the same theory should be given, because to do so is to destroy the very purpose for which instructions are given, and to mystify and confuse the jury. It is true these instructions present the definition in different language, but there is no necessity for it to be defined more than once. Four long instructions upon reasonable doubt, which has never yet been defined or made clearer than the words themselves import, can certainly be of no service to a jury. The practice of repeating instructions should be condemned. It is wrong to do this, and thereby prominently impress a single feature of a case upon a juror. Either of these instructions would have been sufficient, but as to whether or not the repetition of them is reversible error, we will not determine, because, on other grounds the judgment will have to be reversed, and upon a second trial, the necessity for this criticism can be obviated.

Instruction No. 6 tells the jury that they are the sole judges of the evidence, and that they have the right to believe or refuse to believe any witness, and that upon the credibility of any witness, they may take into consideration his interest in the matter in controversy, the reasonableness or unreasonableness of his statements, his bias or prejudice in the matter, if any appear, and his demeanor upon the witness stand. There is no objection pointed out to this instruction, and we think it was properly given.

VI. The court refused to give instructions 5, 8, 9 and 10, as asked by the defendant, but over her objection modified and gave them.

*Instruction No. 5.*—"The court instructs the jury that they are the sole judges of the credibility of the witnesses, and they have a right to believe, or not to believe any witness who has testified in the case."

This instruction was modified by adding the words, "but they cannot arbitrarily disregard the testimony of a witness, unless they believe it untrue." Whether this instruction as asked was proper or not is unnecessary to decide, as the court made a very slight modification and then gave it. The action of the court in modifying and giving it was certainly not error.

*Instruction No. 8.*—"The court instructs the jury that before they could find the defendant guilty of murder, they must believe beyond all reasonable doubt by evidence adduced upon the trial of the case, that the defendant wilfully, maliciously, deliberately, feloniously and unlawfully, killed her husband, Jay Legg."

It is not necessary, in order to find the defendant guilty of murder in the second degree, that the jury believe that she "wilfully, maliciously, deliberately, feloniously and unlawfully" killed her husband, yet this instruction tells them that they must so believe before they can find her guilty of murder, which includes murder in the second degree, and which is charged in the indictment. It would have been clearly misleading to the jury, because it applies to murder of both degrees. To have been proper, it should have been limited to murder in the first degree. Therefore, it was not error to refuse to give it as offered, but the court modified it and gave it in the following form:

*Instruction No. 8.*—"The court instructs the jury. that before they could find the defendant guilty of murder, they must believe beyond all reasonable doubt by evidence adduced upon the trial of the case, that the defendant maliciously, feloniously and unlawfully, killed her husband, Jay Legg."

This modification had the effect of reversing the situation. To have given the instruction as offered would have been error against the state, and as modified it was error against the prisoner. Both murder of the first and second degree are charged in the indictment, and it will not do to tell the jury that before they can convict the prisoner of murder, they must believe that the killing was "maliciously, feloniously and unlawfully" done, because, to have found a verdict of murder in the first degree, as they did find, it was necessary for them to have further believed that the killing was wilful and deliberate. But this instruction, by telling them that before they could find the defendant guilty of murder, they must believe, beyond all reasonable doubt, that the defendant "maliciously, feloniously and unlawfully" killed her husband, practically says to the jury that if they do find it was done "maliciously, feloniously and unlawfully," they could find a verdict of murder in the first degree, which they did find.

*Instruction No. 9.*—''The court instructs the jury that if they believe from the evidence that Jay Legg was accidentally killed, they should find the defendant not guilty.''

*Instruction No. 10.*—''The court instructs the jury that if they believe from the evidence that Jay Legg instructed his wife, Sarah Ann Legg, the defendant, to hand him his gun, and in accordance with such request, she undertook to get the gun down from the rack to hand him, and it was accidentally discharged, and killed said Jay Legg, then the defendant is not guilty as charged in the indictment.''

These instructions properly present to the jury the theory of the defense, that the shooting was accidental, and it was error to refuse to give them. The jury had been instructed upon the state's theory, and it was entirely proper, under the evidence, to tell the jury that if they believed from the evidence that the deceased was accidentally killed, they should find the defendant not guilty. The defendant was entitled to these instructions without any modification. But the court refused to give them as offered, and modified them, so that they read as follows:

*Instruction No. 9.*—''The court instructs the jury that if they believe from the evidence that Jay Legg was accidentally killed, they should find the defendant not guilty, unless they find that such accident was caused by criminal carelessness upon the part of defendant.''

*Instruction No. 10.*—''The court instructs the jury that if they believe from the evidence that Jay Legg requested his wife, Sarah Ann Legg, to hand him his gun, and in accordance with such request she undertook to get the gun down from the rack to hand him, and it was accidentally discharged and killed the said Jay Legg, without criminal carelessness upon the part of the defendant, then the defendant is not guilty as charged in the indictment.''

There is no evidence to justify this modification. There is nothing from which the jury could find criminal carelessness. But suppose there were, the instructions as modified would not be proper. What verdict would the jury find, if they should believe the defendant guilty of criminal carelessness ? These instructions do not say. They are told that they should find the defendant not guilty, if they believe the killing was accidental, unless they further believe that she was guilty of

criminal carelessness. Under the instruction, they might find her guilty of murder in the first degree, which could not be done. Criminal carelessness will not support such a verdict. "One killing another by the mere careless use of a deadly weapon commits only manslaughter." Bishop Crim. Law, vol. 2, sec. 681. And, again, the jury are left to determine what constitutes criminal carelessness, without any instruction upon this point. The question as to what is criminal carelessness is a question of law for the court. The jury are to determine the facts, and the court is to say whether or not these facts are such as to constitute criminal carelessness.

It is charged that the verdict is contrary to the evidence, but, as the judgment is reversed for other reasons, and the case will be re-tried, it is not proper to express any opinion upon the facts.

The judgment of the circuit court is reversed, and a new trial awarded the defendant.

*Reversed.*